AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
### Western District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| A Google Pixel cellular phone; an Apple Macbook Model | ) | Case No. 22-mj-67 |
| A1708; a silver roller luggage bag; an off white colored | ) | |
| Quechua backpack; a gray REI duffle bag; a black Jansport | ) | **SEALED** |
| satchel; a camping saw; three credit cards; a black and | ) | |
| silver sticker and pin; and two lighters and matches | ) | |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following premises located in the Western District of Wisconsin.

See Attachment A.

The person or property to be searched, described above, is believed to conceal:

See Attachment B.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the information described in Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _5-18-23_ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10 p.m. ☒ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge Stephen L. Crocker.

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐for Days delayed days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of Date ending.

☐ Entry without knocking and announcing authority and purpose authorized.

Date and time issued:
_5-4-23 At 10:00 AM_

_____
*Judge's signature*

Magistrate Judge Stephen L. Crocker

Madison, Wisconsin

*AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)*

| **Return** | | |
|---|---|---|
| Case No.:<br>22-mj-67 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| **Certification** |
|---|
|     *I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.*<br><br>Date: _____<br><br>                                                               _____<br>                                                                 *Executing officer's signature*<br><br>                                                              _____<br>                                                                 *Printed name and title* |

## ATTACHMENT A

### Items to be searched

The following items in possession of the FBI in the Western District of Wisconsin:

1. A Google Pixel cellular phone;
2. An Apple Macbook Model A1708;
3. A silver roller luggage bag;
4. An off white colored Quechua backpack;
5. A gray REI duffle bag;
6. A black Jansport satchel;
7. Camping saw
8. Three credit cards
9. Black and silver sticker and pin
10. Two lighters and matches

1

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

1.      All records, physical evidence, documents, programs, applications, and information relating to violations of 18 U.S.C. § 844(1) (the Subject Offense), including, but not limited to:

      a.      Light jeans;

      b.      A black puffer jacket;

      c.      Black surgical masks;

      d.      All records, documents, programs, applications, and information reflecting or relating to any intent, motive, or means of committing the Subject Offense;

      e.      All records, documents, programs, applications, and information reflecting the intent or capacity to harm any person or carry out any threats against any person or property;

      f.      Training, instructional, and reference materials or other information, whether printed or in digital format, relating to Molotov cocktails;

      g.      Records, documents, programs, applications, personal notebooks, journals or materials relating to items listed above;

      h.      Financial records, including bank account records, bank statements, deposit statements/slips, receipts, ledgers, cash receipt books, checks, checkbooks, canceled checks, check registers, withdrawal slips, Certificates of Deposits documents, wire transfers, cashier's checks, money orders, mutual fund and other securities' records, credit applications, loan documents, loan payments, loan statements, notes, invoices and/or bills, payroll records, billing information, safe deposit box records and keys;

      i.      Any electronic device used to facilitate the above-listed violations.

2.     With respect to any electronic device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

a.     evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, monikers, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

b.     evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.     evidence of the presence or absence of computer software, hardware, or other application, which allows for anonymization of usage on a computer device, including Tor, Virtual Private Networks, VMWare, VirtualBox, multiple boot capabilities, virtualization/virtual machine software, and drive cleaning/wiping software;

d.     evidence of the presence or absence of encryption software, hardware, or other application;

e.     any evidence of Internet research or communications regarding Molotov cocktails;

f.     evidence of the attachment of other devices;

g.     evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

h.     evidence of the times the device was used;

i.     passwords, encryption keys, and other access devices that may be necessary to access the device;

2

       j.     applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

       k.     records of or information about Internet Protocol addresses used by the device;

       l.     records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

       m.     Any software, programs, or applications that can be used in the manipulation of data related to individual identifying information, stolen access device information, financial information, or account identifiers that can be encoded on the magnetic stripe of a credit card; and

       n.     Any records relating to electronic communications and/or other correspondence regarding access device fraud, including any stored or deleted communications.

    3.     With respect to items 7-10 of Attachment A, law enforcement is authorized to unpack from evidence as sent from Massachusetts, photograph, and otherwise process.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of electronic storage device or electronic storage; any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form.

# UNITED STATES DISTRICT COURT

for the
Western District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| A Google Pixel cellular phone; an Apple Macbook | ) | |
| Model A1708; a silver roller luggage bag; an off | ) | Case No. 22-mj-67 |
| white colored Quechua backpack; a gray REI | ) | |
| duffle bag; a black Jansport satchel; a camping | ) | **SEALED** |
| saw; three credit cards; a black and silver sticker | ) | |
| and pin; and two lighters and matches | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, Elizabeth Altman, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following premises:
See Attachment A.

located in the Western District of Wisconsin, there is now concealed:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC § 844(i) | Causing damage by fire or an explosive |

The application is based on these facts: See attached Affidavit.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: ____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth in the attached affidavit.

*Applicant's signature*

Elizabeth Altman
*Printed name and title*

Sworn to before me telephonically on

Date:  5-4-23

*Judge's signature*

Magistrate Judge Stephen L. Crocker

Madison, Wisconsin

**<u>AFFIDAVIT</u>**

STATE OF WISCONSIN      )
                        ) ss.
DANE COUNTY             )

     I, Cheryl Patty, being first duly sworn, hereby depose and state as follows:

     1.     I have been employed as a Wisconsin Law Enforcement Officer since November of 1995 as a Dane County deputy, and as a detective since June 2007. I have been assigned to the Federal Bureau of Investigation Madison Resident Agency as a Task Force Officer on the Joint Terrorism Task Force since May 2020. I have received basic law enforcement training and have attended numerous specialized law enforcement-training courses and schools, sponsored by the Wisconsin Department of Justice as well as other law enforcement agencies, relating to the investigation of a wide range of criminal activity. I have specialized training and experience including, but not limited to, homicide investigations, death investigations, fire investigations, sexual assault, stalking, domestic violence, battery, motor vehicle crashes, drug investigations, crimes against children, and other persons and property crimes. Over the course of numerous investigations, I have utilized data obtained through legal process related to cellular records, including location information. I have training and experience in interviewing witnesses and victims of crimes, developing and interviewing suspects and collecting and preserving physical evidence. These investigations often involve the forensic analysis of physical evidence.

1

2.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement agents, agencies, and witnesses.  It does not set forth all my knowledge about this matter.  It is merely intended to show probable cause that  Hridindu Sankar ROYCHOWDHURY, and persons unknown to investigators, have committed violations of Title 18 U.S.C § 844(i), causing damage by fire or an explosive, that occurred at Organization A, an organization located in Madison, Wisconsin.

3.      Based on the facts as set forth in this affidavit, I submit that probable cause exists to believe that ROYCHOWDHURY caused damage by fire or an explosive, to a building that housed  Organization A, an organization involved in activity affecting interstate and foreign commerce, and that evidence relating to this crime, more particularly described in Attachment B, can be found in and on items seized from him, more particularly described in Attachment A.

## PROBABLE CAUSE

4.      On Sunday, May 8, 2022, at approximately 6:06 a.m., Madison Police Department police officers responded to an active fire at an office building located in Madison, Wisconsin.  I know that the building is a multi-level office building located in an area consisting almost exclusively of commercial-use buildings.

5.      The police responded to a 911 call from a civilian, who observed flames coming from a window.

2

6.      Upon arrival at the location, the police observed a fire in an office on the Northwest corner of the building.  On the north facing side of the building, the third window from the west end, facing the driveway, was broken.  The police observed that inside the office, a row of books was lined up adjacent to the window and were smoking and burning with small flames.  The police observed a mason jar directly under the area where the books were on fire.  A red handkerchief was wrapped around the edge of the windowpane glass as if it was used to pry the broken glass from the window.

7.      The police walked the perimeter of the building. On the west side, the police observed large black words spray painted in cursive style writing, "If abortions aren't safe then you aren't either."  On the south facing wall of an alcove of the building, the police observed black spray painting with a large "A" with a circle around it and the number "1312."

8.      Madison Fire Department responded, extinguished the fire, and gained access to the interior of the building.  The police also went inside the building.

9.      Once inside the building, the police observed the mason jar under the window; the jar was broken, and the lid and screw top were burned black.  The police also saw a purple disposable lighter near the mason jar.  On the opposite wall from the window, the police saw another mason jar with the lid on, and a blue cloth tucked into the screw top, with one edge slightly singed.  The jar was about half full of a clear fluid that smelled like an accelerant, possibly kerosene.  A Special Agent/Certified Fire Investigator (SA/CFI) with the Bureau of Alcohol, Tobacco, Firearms, and Explosives

3

(ATF) later smelled the fluid and believed that it smelled like a flammable or combustible liquid.

10.     The fire occurred in an office suite occupied by Organization A. The individual office affected by the fire belongs to the president of Organization A. Through this investigation, I have learned that Organization A maintains a website and uses social media to promote its goals.

11.     The police spoke with the president of Organization A, who reported that while they previously received threats due to their positions on certain social issues, none of the threats were received over the last week.  After the news of the potential Supreme Court decision in *Dobbs v. Jackson Women's Health Organization*, Organization A and its president have been vocal about their position on abortion rights.  Organization A issued press releases and the president participated in interviews.

12.     The ATF SA/CFI conducted an Origin and Cause investigation at the location, and the agent advised that the fire was caused by the application of an open flame to flammable/combustible vapors and was therefore classified as incendiary.

13.     The ATF SA/CFI advised me that fire investigators collected a glass container with an attached fabric cloth, containing an unknown, clear liquid, consistent with the appearance and components of a Molotov cocktail, a breakable container, which contains a flammable/combustible liquid, and a wick.  The devices are known to investigators to have initiated fires.  The contents were sent to the ATF laboratory for further analysis.

14. Preliminary ATF laboratory results from a forensic biologist show that the forensic biologist discovered DNA on multiple pieces of evidence suitable for further testing. The forensic biologist obtained DNA profiles from three different individuals. All the DNA profiles were located on evidence collected by investigators at the scene and sent to the ATF laboratory for analysis.

15. One DNA profile discovered during the forensic process indicates that a male profile, "Male 1," appears to be present on swabs from the top and bottom of the window glass, swabs from the exterior of the glass jar, swabs from the body of the lighter as well as swabs of the black and silver top of the lighter, including the ignition wheel and button of the lighter, and swabs from the exterior of the Molotov cocktail, and the blue cloth used in that Molotov cocktail.[1]

16. The ATF Laboratory submitted all the DNA profiles to the Combined DNA Index System (CODIS) to determine if the DNA profiles were already in the system. The search of CODIS returned no hits/matches.

17. On January 21, 2023, Wisconsin State Capitol Police were monitoring the Wisconsin State Capitol exterior cameras overseeing a planned protest related to an officer-involved shooting in Atlanta, Georgia. During the protest at the Wisconsin State Capitol, law enforcement observed multiple individuals in various areas of the Capitol grounds spray painting graffiti.

---

[1] Additional DNA profiles were obtained from the scene and analyzed. Law enforcement has not yet been able to match them to a suspect.

18.     On January 26, 2023, law enforcement continued to review surveillance camera footage from January 21, 2023, and observed two suspects, one who is seen spray painting "We will get revenge" with black spray paint in a cursive-style writing on the Capitol grounds.  The message appeared to have some visual similarities to the graffiti left at Organization A; the comparisons have been sent to the FBI for analysis.

19.     On February 1, 2023, law enforcement conducted further review of surveillance camera footage from the Capitol exterior, and two suspects were observed arriving on the Capitol square at approximately 5:04 p.m.  Law enforcement later observed the suspects leave the Capitol square at 5:25 p.m.

20.     On February 3, 2023, law enforcement viewed surveillance footage for the Tenney Plaza Parking Ramp from January 21, 2023, from 4:55 p.m. to 7:05 p.m., to attempt to identify the men who spray painted the sidewalk at the Capitol.  Law enforcement saw a white Toyota pickup truck enter the parking lot at 4:58 p.m.  The vehicle had no front plate.  Minutes later, at 5:03 p.m., law enforcement observed both suspects walk past the camera.  At 6:54 p.m., law enforcement observed both suspects enter the parking ramp on foot, then walk out of camera view.  At 6:58 p.m., law enforcement observed a white Toyota pickup truck leave the parking lot.  That white pickup truck was a Toyota Tacoma and had a visible number on its rear license plate.

21.     Law enforcement checks of the Wisconsin license plate returned to a white 2005 Toyota Tacoma pickup truck registered to Citizen 1 at a home in Madison, Wisconsin.

6

22.     On February 22, 2023, law enforcement located an Instagram post that posted the flyer for the Stop Cop City event at the Capitol on January 21, 2023.  In the "likes" this post received, law enforcement saw the Instagram profile @Hridindu (Display name: Hridindu Roychowdhury).  This Instagram user matched a person law enforcement had seen listed in Citizen 1's associated individuals.

23.     Law enforcement checks revealed that Hridindu Sankar ROYCHOWDHURY currently resides at the same address as Citizen 1.

24.     On March 1, 2023, law enforcement observed the white Toyota Tacoma with the same license plate as was seen leaving the parking ramp being driven by an individual law enforcement believed was ROYCHOWDHURY.  He was alone in the vehicle.  Law enforcement saw the vehicle pull into the Dutch Mill Park and Ride parking lot located at 46 Collins Court, Madison, Wisconsin.

25.     Law enforcement observed ROYCHOWDHURY park the vehicle in one of the vacant parking spots and remain parked for approximately 10-15 minutes.  Law enforcement kept the vehicle in direct sight the entire time.  At 3:40 p.m., law enforcement observed ROYCHOWDHURY step out of the driver's door of the vehicle.  Law enforcement could see ROYCHOWDHURY clearly from their location, approximately 100 feet away.  ROYCHOWDHURY's face was exposed and visible to law enforcement.  Law enforcement identified the driver by comparing the person they saw to ROYCHOWDHURY's Wisconsin driver's license photograph.  After law enforcement observed ROYCHOWDHURY step out of the vehicle, law enforcement noticed him holding a brown fast food bag.  Law enforcement saw ROYCHOWDHURY

7

discard this bag on a pile of trash centered on a bin on a traffic island within the parking lot. Law enforcement then observed ROYCHOWDHURY get back into the vehicle and drive out of the parking lot.

26.    Law enforcement had an unimpeded view of the brown paper bag ROYCHOWDHURY discarded. Law enforcement immediately walked up to the bin after ROYCHOWDHURY left the area. Law enforcement saw no other individuals near the bin, nor did law enforcement view anyone discard anything else in the bin between the time ROYCHOWDHURY discarded the brown paper bag to the point law enforcement walked up to it.

27.    Law enforcement visually identified the bag as a fast food bag. The bag was crumpled shut near the top and appeared to have contents inside. Law enforcement further confirmed that this was the bag discarded by ROYCHOWDHURY because all the other trash beneath and surrounding it was water soaked from the precipitation earlier in the day. The fast food bag, however, was dry. And there was no other brown paper bag visible in the trash can.

28.    Law enforcement retrieved the bag from the trash. The contents of the bag included a quarter portion of a partially eaten burrito wrapped in waxed paper, a soiled napkin, a crumpled napkin, a stack of napkins, the wrapper of the burrito, a crumpled food wrapper, four unopened hot sauce packets, and the brown paper bag itself.

29.     Law enforcement sent the collected evidence from the bag discarded by ROYCHOWDHURY to the ATF laboratory for analysis.  Additionally, law enforcement swabbed the burrito for DNA and sent the swab to the ATF lab.

30.     On March 17, 2023, the ATF laboratory advised that a forensic biologist with the ATF laboratory examined the evidence law enforcement submitted and located a DNA profile.  The results from the ATF laboratory indicate the DNA collected from the contents of the brown paper bag is a match to the DNA of "Male 1" that was recovered from evidence at the arson that occurred at Organization A.

31.     On March 27, 2023, this Court issued an arrest warrant for ROYCHOWDHURY.  On that same date, an anticipatory search warrant was issued by the United States District Court for the District of Massachusetts authorizing the collection ROYCHOWDHURY'S DNA taken by buccal (oral) swabs.

32.     On March 28, 2023, at about 5:15 a.m., law enforcement located ROYCHOWDHURY and took him into custody at the Boston Logan International Airport Terminal B, 1 Harborside Dr. Boston, MA 02128.  Agents had observed ROYCHOWDHURY check a small duffle bag and carry the remainder of his property with him through the security checkpoint.

33.     Law enforcement retrieved ROYCHOWDHURY's checked bag and then ROYCHOWDHURY and his personal property were escorted to the Massachusetts State Police Troop F building at 2 Service Rd. East Boston, MA 02128.

34.     Boston FBI staff completed an inventory of ROYCHOWDHURY's personal property in keeping with established policy and past practice to secure

ROYCHOWDHURY's personal effects. The property was generally inventoried as a Google Pixel cellular phone, an unknown white powdery substance in a plastic bag, a camping saw, an Apple Macbook Model A1708, three credit cards, $3.25 in US Currency, a black and silver sticker and pin, a silver roller luggage bag, an off white Quechua backpack, a gray REI duffle bag, a black Jansport satchel, two lighters and matches, a bracelet, a ring, and a boarding pass.  These items were secured by Boston FBI at the headquarters evidence room pending shipment to the Western District of Wisconsin.

35.      In addition, on March 28, 2023, the DNA warrant was executed on ROYCHOWDHURY and the swabs were sent to the ATF Laboratory for testing. The results from the laboratory confirmed that ROYCHOWDHURY was a match to the DNA of "Male 1" that was recovered from evidence at the arson that occurred at Organization A, and a match to the burrito DNA.

36.      On April 27, 2023, the above items were transferred from the Milwaukee FBI Evidence room to the Madison Resident Agency located at 8215 Greenway Blvd Middleton, WI 53562, within the Western District of Wisconsin.  The white powdery substance, US Currency, bracelet, ring, and boarding pass were not transferred and remained in the Milwaukee evidence vault.

## TECHNICAL TERMS

37.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a.    "Cellular telephone" or "cell phone" means a hand-held wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may include geolocation information indicating where the cell phone was at particular times.

b.    "Computer," is defined in 18 U.S.C. § 1030(e)(1) as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

11

c.      "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices such as, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, and other memory storage devices; peripheral input/output devices such as, keyboards, printers, video display monitors, and related communications devices such as cables and connections; and any devices, mechanisms, or parts that can be used to restrict access to computer hardware such as, physical keys and locks.

d.      "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital for. It commonly includes programs to run operating systems, applications, and utilities.

e.      "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

f.      "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security

12

software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, or hide protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

g.      The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form such as, writings or drawings; photographic form such as prints, negatives, videotapes, motion pictures, or photocopies; mechanical form such as printing or typing; or electrical, electronic or magnetic form such as tape recordings, cassettes, compact discs, hard drives, Personal Digital Assistants, Multi Media Cards, USB devices, smart cards, and memory calculators, as well as printouts or readouts from any magnetic, electrical or electronic storage device.

h.      "Electronic storage devices" includes computers, cellular telephones, tablets, and devices designed specifically to store electronic information (e.g., external hard drives and USB "thumb drives"). Many of these devices also permit users to communicate electronic information through the internet or through the cellular telephone network (e.g., computers, cellular telephones, and tablet devices such as an iPad).

13

## ELECTRONIC STORAGE DEVICES AND FORENSIC ANALYSIS

38.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

39.     As explained below, information stored within a cellular phone (cell phone) may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored within a cell phone can indicate who has used or controlled the cell phone.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, contacts lists, instant messaging logs, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the cell phone at a relevant time.  Further, such stored electronic data can show how and when the cell phone and its related account were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cell phone access, use, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cell phone account owner.  Additionally, information stored within a cell phone may indicate the geographic location of the cell phone and user at a particular time (e.g., location integrated into an image or video sent via email or text message to include both

14

metadata and the physical location displayed in an image or video).  Last, stored

electronic data may provide relevant insight into the cell phone owner's state of mind as

it relates to the offense under investigation.  For example, information in the cell phone

may indicate the owner's motive and intent to commit a crime (e.g., communications

relating to the crime), or consciousness of guilt (e.g., deleting communications in an

effort to conceal them from law enforcement).  Unless this data is destroyed, by

breaking the cell phone itself or by a program that deletes or over-writes the data

contained within the cell phone, such data will remain stored within the cell phone

indefinitely.

40.     I submit there is probable cause to believe that things that were once

stored on the electronic storage devices may still be stored there, for at least the

following reasons:

a.     Based on my knowledge, training, and experience, I know that

computer files or remnants of such files can be recovered months or even years after

they have been downloaded onto a storage medium, deleted, or viewed via the Internet.

Electronic files downloaded to a storage medium can be stored for years at little or no

cost.  Even when files have been deleted, they can be recovered months or years later

using forensic tools.  This is so because when a person "deletes" a file on a computer,

the data contained in the file does not actually disappear; rather, that data remains on

the storage medium until it is overwritten by new data.

b.     Therefore, deleted files, or remnants of deleted files, may reside in

free space or slack space—that is, in space on the storage medium that is not currently

15

being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

       c.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

       d.    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

    41.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

       a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word

processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

       b.      Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

       c.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

       d.      The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual

information necessary to understand other evidence also falls within the scope of the warrant.

        e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

      42.    *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

_____

Cheryl Patty
Detective, Dane County Sheriff's Office
Task Force Officer, Federal Bureau of
Investigation

Telephonically sworn before me this _____ 4ᵗʰ _____ day of May.

_____
Honorable STEPHEN L. CROCKER
United States Magistrate Judge

ATTACHMENT A

Items to be searched

The following items in possession of the FBI in the Western District of Wisconsin:

1. A Google Pixel cellular phone;
2. An Apple Macbook Model A1708;
3. A silver roller luggage bag;
4. An off white colored Quechua backpack;
5. A gray REI duffle bag;
6. A black Jansport satchel;
7. Camping saw
8. Three credit cards
9. Black and silver sticker and pin
10. Two lighters and matches

1

## ATTACHMENT B

### ITEMS TO BE SEIZED

1.      All records, physical evidence, documents, programs, applications, and information relating to violations of 18 U.S.C. § 844(1) (the Subject Offense), including, but not limited to:

      a.      Light jeans;

      b.      A black puffer jacket;

      c.      Black surgical masks;

      d.      All records, documents, programs, applications, and information reflecting or relating to any intent, motive, or means of committing the Subject Offense;

      e.      All records, documents, programs, applications, and information reflecting the intent or capacity to harm any person or carry out any threats against any person or property;

      f.      Training, instructional, and reference materials or other information, whether printed or in digital format, relating to Molotov cocktails;

      g.      Records, documents, programs, applications, personal notebooks, journals or materials relating to items listed above;

      h.      Financial records, including bank account records, bank statements, deposit statements/slips, receipts, ledgers, cash receipt books, checks, checkbooks, canceled checks, check registers, withdrawal slips, Certificates of Deposits documents, wire transfers, cashier's checks, money orders, mutual fund and other securities' records, credit applications, loan documents, loan payments, loan statements, notes, invoices and/or bills, payroll records, billing information, safe deposit box records and keys;

      i.      Any electronic device used to facilitate the above-listed violations.

2.    With respect to any electronic device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

a.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, monikers, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

b.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.    evidence of the presence or absence of computer software, hardware, or other application, which allows for anonymization of usage on a computer device, including Tor, Virtual Private Networks, VMWare, VirtualBox, multiple boot capabilities, virtualization/virtual machine software, and drive cleaning/wiping software;

d.    evidence of the presence or absence of encryption software, hardware, or other application;

e.    any evidence of Internet research or communications regarding Molotov cocktails;

f.    evidence of the attachment of other devices;

g.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

h.    evidence of the times the device was used;

i.    passwords, encryption keys, and other access devices that may be necessary to access the device;

2

j.      applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

k.      records of or information about Internet Protocol addresses used by the device;

l.      records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.      Any software, programs, or applications that can be used in the manipulation of data related to individual identifying information, stolen access device information, financial information, or account identifiers that can be encoded on the magnetic stripe of a credit card; and

n.      Any records relating to electronic communications and/or other correspondence regarding access device fraud, including any stored or deleted communications.

3.      With respect to items 7-10 of Attachment A, law enforcement is authorized to unpack from evidence as sent from Massachusetts, photograph, and otherwise process.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of electronic storage device or electronic storage; any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form.

3