UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        Plaintiff,

      v.                                Case No. 23-cr-31-wmc

HRIDINDU SANKAR ROYCHOWDHURY,

        Defendant.

---

GOVERNMENT'S SENTENCING MEMORANDUM

---

Following the leak of the Supreme Court's draft opinion in *Dobbs v. Jackson Women's Health Organization* on May 2, 2022, which signaled the reversal of *Roe vs. Wade*, the defendant, Hridindu Roychowdhury, attempted to firebomb Organization A. Additionally, he obtained personal information for two then-executives of that organization and continued to track their personal data for more than at least four months after the attack. By his violent act at Organization A, Roychowdhury tried to intimidate and frighten those who disagreed with him. Since being arrested, it seems he has demonstrated little remorse or regret for his actions. He deserves a substantial sentence for using violence to intimidate those with views different than his own. As explained below, based on the consideration of all of the 18 U.S.C. § 3553(a) factors, a guideline sentence is warranted.[1]

---

[1] For the reasons discussed below, the Government believes the Probation Office properly applied the terrorism enhancement pursuant to USSG § 3A1.4 in the original PSR. If, however, the Court disagrees, the government asserts that an upward departure, as provided for in Application Note 4, is applicable and a sentence between 151 and 188 months is still warranted.

I.      FACTUAL BACKGROUND AND OFFENSE CONDUCT

On Sunday, May 8, 2022, at approximately 6:06 a.m., Madison Police Department police officers responded to an active fire at an office building located in Madison, Wisconsin.  The police responded to a 911 call from a civilian, who observed flames coming from a window.

Upon arrival at the location, the police observed a fire in an office on the Northwest corner of the building.  On the north facing side of the building, the third window from the west end, facing the driveway, was broken.  The police observed that inside the office, a row of books was lined up adjacent to the window and were smoking and burning with small flames.  The police observed a mason jar directly under the area where the books were on fire.  A red handkerchief was wrapped around the edge of the windowpane glass as if it was used to pry the broken glass from the window.

The police walked the perimeter of the building. On the west side, they observed large black words spray painted in cursive style writing, "If abortions aren't safe then you aren't either."  On the south facing wall of an alcove of the building, the police observed black spray painting with a large "A" with a circle around it and the number "1312."

Madison Fire Department responded, extinguished the fire, and gained access to the interior of the building.  The police also went inside the building.  Once inside the building, the police observed the mason jar under the window; the jar was broken, and the lid and screw top were burned black.  The police also saw a purple disposable

lighter near the mason jar.  On the opposite wall from the window, the police saw another mason jar with the lid on, and a blue cloth tucked into the screw top, with one edge slightly singed.  The jar was about half full of a clear fluid that was later determined to be gasoline.

The Origin and Cause report determined that the fire was caused by the application of an open flame to flammable/combustible vapors and was therefore classified as incendiary. Fire investigators collected a glass container with an attached fabric cloth, containing an unknown, clear liquid, consistent with the appearance and components of a Molotov cocktail, a breakable container, which contains a flammable/combustible liquid, and a wick.

The defendant's DNA was found on the top and bottom of the window glass, the exterior of the glass jar, the lighter, the exterior of the Molotov cocktail, and the blue cloth used in that Molotov cocktail.

On March 28, 2023, agents executed a search warrant at the defendant's home. There, in the garage, they found additional Molotov cocktails just like the ones used to firebomb Organization A.



While not clear in this picture, the jars contained gasoline.

On May 4, 2022, after the leak of the controversial Supreme Court decision

relating to *Dobbs*, but prior to attempting to firebomb Organization A, the defendant

purchased a Whitepages.com subscription.[2]   On May 5, 2022, the defendant received an

---

[2] According to Whitepages.com, basic information, such as a person's current address and land line phone number are free.  For a cost, subscribers can get "premium data" or "premium contact information."  This information includes cell phone numbers, email addresses, social media profiles, criminal records, property data, and background reports.  This information is available either on a one-time basis or at a discount when someone has a subscription.

4

email from Whitepages confirming the report monitor was active for Executive 1 of Organization A.  One day later, the defendant received an email from Whitepages confirming the report monitor was active for Executive 2 of Organization A. That same day, the defendant received an email from Whitepages saying, "we found one property for [Executive]." An email sent on June 7, 2022, confirmed the defendant had been monitoring them for the prior 30 days.  An email sent on September 27, 2022, showed that one of the executives was still being monitored.

II.     SENTENCING GUIDELINES

The PSR increased the defendant's guideline calculation by 12 levels, pursuant to USSG §  3A1.4(a).  (R. 56, ¶ 39).  The defendant objected to this enhancement.  (R. 63, pgs. 4-6), arguing that the enhancement does not apply because Roychowdhury attacked a private business, not a government facility.  The PSR subsequently was amended based on, at least in part, the defense argument that the adjustment may not apply because Roychowdhury attacked a private business.  (R. 65).

The 12-level increase pursuant to § 3A1.4 is warranted in this case.  The defendant attacked an organization to retaliate against government conduct and to further his ideological position on the issue of abortion. That Roychowdhury physically attacked a private organization rather than a government building is not significant; the reasons why Roychowdhury attacked the organization are what matters.

The victim in this case is engaged with government entities in the democratic process; indeed, the victim works with governments as part of the legislative process on the issue of abortion, which was the subject of the Supreme Court's decision in *Dobbs*.

Six days after the *Dobbs* decision was leaked, but months before the decision was published, Roychowdhury identified Organization A and attacked it.  The attack on a pro-life lobbying organization mere days after the *Dobbs* decision was leaked cannot be dismissed as a mere act of violence or coincidence. Accordingly, the terrorism enhancement applies, and the defendant's offense level should be increased by 12 levels and his criminal history category should be VI.

A.      The Terrorism Enhancement Applies

An adjustment for terrorism applies when the offense "involved, or was intended to promote, a federal crime of terrorism." The term "federal crime of terrorism" is defined by statute in 18 U.S.C. § 2332b(g)(5).  *See* U.S.S.G. § 3A1.4, cmt. n.1. A "federal crime of terrorism" is a violation of one of the enumerated offenses listed in Section 2332b(g)(5)(B) where such offense was "calculated to influence or affect the conduct of government by intimidation or coercion, or to *retaliate* against government conduct." (emphasis added).

i.      The offense "involves" a federal crime of terrorism if the offense is enumerated in Section 2332b(g)(5)(B)

Courts have held that when the offense of conviction is an enumerated terrorism offense, it "involved or was intended to promote a federal crime of terrorism." *United States v Christianson*, 586 F.3d 532, 539-540 (7th Cir. 2009).   Here, the defendant pled guilty to violating Section 844(i), which is an enumerated offense listed within Section 2332b(g)(5)(B). Therefore, the offense of conviction "involves or was intended to promote" a federal crime of terrorism.

ii.      The offense was calculated to retaliate against government conduct

6

and to influence or affect the conduct of government by
intimidation or coercion

A defendant's offense is "calculated" as required by Section 3A1.4 if the offense was specifically intended to have the effect of influencing, affecting, or retaliating against government by force or the threat of force. *See*, *e.g.*, *Christianson*, 586 F.3d at 539 ("The Guidelines provide a practical definition for what constitutes an act of terrorism, and thereby establishes a very workable definition of who is a terrorist. It looks at the crime involved and the perpetrator's motive. If the act . . . was 'calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct,' then it is a federal crime of terrorism. And for all intents and purposes at sentencing, that person is a terrorist."). *See also*, *United States v. Mohammed*, 693 F.3d 192, 201 (D.C. Cir. 2012) (defendant's narcoterrorism offense had requisite "calculation" where evidence showed defendant "specifically intend[ed] to use the commission from the drug sales to purchase a car to facilitate attacks against U.S. and foreign forces in Afghanistan"). While it may seem odd that the defendant attacked a Wisconsin organization to influence the government, that is the twisted logic and indeed, the very definition of terrorism as the term is commonly used.[3]

Moreover, a defendant's intent to influence government conduct or retaliate against the government need not have been his "sole" or "primary" purpose and the "calculation" requirement may be satisfied even if a defendant's relevant conduct

---

[3] See Oxford Languages: "the unlawful use of violence and intimidation, especially against civilians, in the pursuit of political aims" or Dictionary.com "the unlawful use of violence or threats to intimidate or coerce a civilian population or government, with the goal of furthering political, social, or ideological objectives."

sought to "accomplish other goals simultaneously."  *United States v. Van Haften*, 881 F.3d 543, 545 (7th Cir. 2018); *see also United States v. Haipe*, 769 F.3d 1189, 1193 (D.C. Cir. 2014) (defendant's "money-raising goals obviously do not preclude a finding of intent to influence government policy" even if raising money was defendant's "primary purpose").  Section 3A1.4 is applicable regardless of the defendants' claimed magnanimous intent.  *Christianson*, 586 F.3d at 539 (affirming application of the adjustment for defendants who professed to "sav[e] our earth," because "the purpose behind defendants' actions was to further [their] political agenda: the end to industrial society").

Here, it is clear the defendant's purpose for the attack on Organization A was twofold: 1) to retaliate against the Supreme Court, a branch of the federal government, for its changed position on the legality of abortion and putting the issue before individual states; and 2) in wake of that, to influence state legislatures by showing that violence will result if states, following *Dobbs*, restricted abortion.  Less than one week after the *Dobbs* opinion was leaked, on May 8, 2022, Roychowdhury attacked Organization A, which engages in pro-life advocacy and policy work directed toward federal and state legislatures.

The timing of this violent attack is relevant in analyzing Roychowdhury's motive.  The leaked information regarding the *Dobbs* decision undoubtedly stirred emotions and passions on both sides of the abortion debate. It is within this volatile context that the defendant chose to commit this crime. By targeting a pro-life lobbying organization, the defendant sought to send a chilling message to those who advocate

8

for, and legislate, policies aligned with the decision.

The defendant's conduct—attempting to firebomb an organization whose purpose in part is to "support the sanctity of human life and pro-life efforts to protect the unborn" mere days after the leaked *Dobbs* decision, but before the decision formally was published—was, at a minimum, calculated to retaliate against the government for the decision, evidenced, in part, by the defendant's own words that he spray painted on the building—"If abortions aren't safe then you aren't either."

What is more, there are broader implications of such a violent act in this context—the attempted bombing of a pro-life advocacy organization goes beyond the mere destruction of property; it strikes at the heart of our democratic principles. Legislative advocacy is a legitimate means for individuals and organizations to petition their government for redress of grievances and to seek change in government policy and the law.  The defendant could have engaged in peaceful pro-choice advocacy, leafleting, getting out the vote, or running as a candidate in support of his views.  He did none of these.  By resorting to violence, the defendant struck at the core of our democratic system. This attack—to be sure—was not merely the misguided action of an individual; rather, it was a calculated attempt to influence government policy through fear and intimidation.

When objecting to the initial PSR, the defense argued that the terrorism enhancement does not apply unless the defendant attacked government property. That is incorrect. The application of the enhancement is based on the defendant's motivation for the attack, not the subject of his attack. For example, in *United States v. Mason*, 410 F.

App'x 881, 884 (6th Cir. 2010) , the Court applied the enhancement to a defendant who set fire to university research facilities and commercial logging equipment. Mason was part of the Earth Liberation Front, a movement committed to stopping commercial, research, and other activities that its members consider harmful to the natural environment. Mason learned that Agriculture Hall at Michigan State University received funding for plant genetic research. On December 31, 1999, Mason set fire to Agriculture Hall. *Mason*, 410 F. App'x at 883–84. The next day, Mason set fire to commercial logging equipment that was parked along a road. The arson was motivated by a desire to intimidate, coerce, and deter government agencies from conducting or supporting the commercial logging industry. *Id.* It did not matter that the object of Mason's arson was a university and commercial logging equipment. *See also United States v. Mandhai*, 375 F.3d 1243, 1248 (11th Cir. 2004) (applying the terrorism enhancement and stating, "Mandhai's goal was to bomb and disable public utilities in the hopes that power outages would lead to civil strife and upheaval on the streets of Miami.").  Likewise, it does not matter that Roychowdhury attacked a private organization; the reason for his attack controls the analysis. And his reason—which is clear based on the timing and the object of the attack and the message he left at the scene—was to retaliate against government conduct and to influence the government through fear and intimidation.

> B.     At a minimum, the Court should depart upward given Roychowdhury's intent to intimidate civilians

If the Court finds the enhancement does not apply, at a minimum, the Court should depart upward as permitted under Note 4 to the Terrorism Enhancement.  USSG

§ 3A1.4, n. 4.  Note 4 provides that an upward departure is "warranted" if the "terrorist motive was to intimidate or coerce a civilian population, rather than to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  *Id.*, cmt. n.4.  Here, not only did the defendant attempt to firebomb an advocacy organization, but he also specifically threatened the citizens who worked there by spray painting the side of the building: "If abortions aren't safe then you aren't either."  The defendant's own graffiti shows that he wanted to intimidate and coerce at least Organization A employees and likely pro-life advocates nationwide.

When it adopted Note 4, the Sentencing Commission explained that it is "an *encouraged, structured upward departure,*" the purpose of which is to provide courts with "a viable tool to account for the harm involved during the commission of these offenses on a case-by-case basis" and to "make[] it possible to impose punishment equal in severity to that which would have been imposed if the § 3A1.4 adjustment actually applied."  Sentencing Guidelines, App. C, amend. 637 (2002) (emphasis added).

In *United States v. Jordi,* 418 F.3d 1212 (11th Cir.2005), the defendant pled guilty to attempted arson, in violation of 18 U.S.C. § 844(i), based on his plan to destroy abortion clinics using explosive devices. *Id.* at 1213–14. The government moved for an upward departure, arguing **"**Jordi's crime involved planned terrorist acts intending to intimidate or coerce a civilian population." *Id.* at 1214; U.S.S.G. § 3A1.4, comment. (n.4). The district court denied the motion, finding that "'terrorism . . . requires a showing that the defendant's crime transcended national boundaries.'" *Jordi,* 418 F.3d at 1214. The Eleventh Circuit disagreed and remanded to the district court. The law is clear that

transcending national boundaries is not required for the terrorism enhancement and its application note to apply.

Other sentencing courts have also upwardly departed under Note 4, where convictions "involved, or were intended to promote" an enumerated offense under 18 U.S.C. § 2332b(g)(5)(B), as is the case here, but the "terrorist motive was to intimidate or coerce a civilian population." *See United States v. Harpham*, 2:11-cr-00042-WFN (E.D. Wash.), applied in *United States v. Harpham*, 2012 WL 220276 (E.D. Wash. Jan. 25, 2012) (three offense-level departure applied to defendant who placed explosive device along the Martin Luther King, Jr. Day parade targeting parade participants); *United States v. Cottrell*, 2:04-cr-00279-RGK (C.D. Cal.), *aff'd*, *United States v. Cottrell*, 312 F. App'x 979, 981 (9th Cir. 2009) (per curiam), *superseded on other grounds* in 333 F. App'x 213 (9th Cir. 2009) (per curiam) (after application of Note 4, defendant sentenced to 100 months of imprisonment for participating in conspiracy to commit vandalism and arson of SUVs in connection with environmental extremist organization); *United States v. Jordi*, 03-cr-60259-JIC-1 (S.D. Fla.), *aff'd*, *United States v. Jordi*, 418 F.3d 1212 (11th Cir. 2005) (after application of Note 4, defendant sentenced to 10 years of imprisonment in connection with conviction for planned bombing of abortion clinics meant to dissuade doctors from performing abortions); *see also United States v. Holzer*, 19-cr-00488-RM (D. Colo.) (finding that Note 4 applied to defendant convicted of attempted arson of a synagogue, but describing 235-month sentence of imprisonment as the result of an upward "variance"). This Court should do so as well.

III.    <u>SENTENCING ARGUMENT</u>

Upon properly calculating the advisory guideline range, the Court then looks to

the sentencing factors set forth in 18 U.S.C. § 3553(a), which states:

> (a)    Factors to be considered in imposing a
> sentence.--The court shall impose a sentence
> sufficient, but not greater than necessary, to
> comply with the purposes set forth in
> paragraph (2) of this subsection. The court, in
> determining the particular sentence to be
> imposed, shall consider—
>
> (1)    the nature and circumstances of the
> offense and the history and
> characteristics of the defendant;
>
> (2)    the need for the sentence imposed—
>
> (A)    to reflect the seriousness of the offense,
> to promote respect for the law, and to
> provide just punishment for the offense;
>
> (B)    to afford adequate deterrence to
> criminal conduct;
>
> (C)    to protect the public from further
> crimes of the defendant; and
>
> (D)    to provide the defendant with
> needed educational or vocational
> training, medical care, or other
> correctional treatment in the most
> effective manner;
>
> (3)    the kinds of sentences available;
>
> (4)    the kinds of sentence and the sentencing
> range established for—
>
> (5)    any pertinent policy statement—
>
> (6)    the need to avoid unwarranted sentence

> disparities among defendants with
> similar records who have been found
> guilty of similar conduct; and

(7)     the need to provide restitution to any
        victims of the offense.

18 U.S.C. § 3553(a).  Most relevant among these factors to this case are the nature and

circumstances of the offense, the history and characteristics of the defendant, the need

to reflect the seriousness of the offense, the need to provide just punishment, and the

need to protect the public.

A.     Nature and Circumstances of the Offense

The nature and circumstances of the offense are aggravated.  The defendant,

along with at least one other person whom the defendant has refused to identify,

attempted to firebomb an organization that supported beliefs different than his own.

Prior to doing so, he obtained the personal information for two executives of the

organization.  Executive 1 indicated she felt personally targeted because the fire was set

in her office.   As she noted in her victim impact statement, "The threat was clear.

Nobody on our team was safe."

The defendant committed this crime with at least one other person; however, the

defendant's DNA on key components show that the defendant was a primary actor in

the offense. And, while the Molotov cocktails did not actually function as designed, the

conduct was still egregious - they still caused a fire that extensively damaged

Organization A.  Even though no one was there when Roychowdhury and others

attempted to firebomb it, he still committed a violent attack in furtherance of his social

views.  Solely because Roychowdhury disagreed with Organization A's beliefs, he

chose to attack it.  This egregious offense conduct calls for a substantial sentence.

B.      History and Characteristics of the Defendant

The defendant committed a violent crime against an organization whose views differ from his.  And he seemingly planned, or at least left the option open, to commit other violent acts since, as noted above, law enforcement found additional Molotov cocktails at the defendant's home.

The defense will likely attempt to portray the defendant as a brilliant Ph.D. student and employee.  There is no question the defendant is intelligent and worked hard to obtain his Ph.D.  However, he used his studies and the degree to which it led to get access to places where he could obtain chemicals to use for his own nefarious purposes.

As far back as July 2020, the defendant showed his interests in using incendiary devices and avoiding detection.  Using Signal, an application that encrypts communications, the defendant says that incendiary devices he made "don't really burn," and wonders if he should put kerosene in them.  (R. 64, ¶ 28).  He also says to a friend, "let's make some thermite.[4]"   The friend responds, "lmao, delete that message." (Id.).

The next day, in another Signal conversation, the same friend asks what materials are needed and the defendant provided a list of materials. (R. 64, ¶ 28).  And just in case there was any question as to what the two intended to do with the

---

[4] According to the internet, thermite is a pyrotechnic composition of metal powder and metal oxide.  When ignited by heat or chemicals, it can create brief bursts of heat and high temperatures in a small area.

chemicals, they exhibit fear that the chemicals they want are traceable. (Id.).[5]

The defendant also obtained items for other people, rejecting payment, indicating that he was spending grant money entrusted to the University of Wisconsin.[6] In January of 2022, the defendant got nervous about using the UW lab to obtain materials.  When offered another suggestion, he indicated he preferred to embezzle.[7]

He also had people at the lab help him obtain chemicals after he left. For example, in May of 2022, he reached out to a contact at UW asking to use the lab to receive misoprostol[8] and the recipient to "snag" him some nitric acid. (R. 64, ¶ 28).

The fact that some of the materials he was embezzling don't appear to be used for creating explosives shows the extent of illegal activity he was involved in.  It also shows his strong pro-choice ideology, something he demonstrated in the chosen target of his crime.

Once the defendant got a job outside of the UW, he began to embezzle from his new employer.  Not only did his embezzlement continue, but in a message one month after the attack on Organization A, but before he had been identified and arrested, he also boasted that he was doing things "far riskier than petty embezzlement."[9]

It is true that the defendant has no criminal history.  However, that does not mean this is the first crime he has committed, merely that he has not been caught and prosecuted before.  In addition to embezzlement, it appears the defendant was selling

---

[5] The complete conversation is attached as Exhibit A.
[6] The complete conversation is attached as Exhibit B.
[7] The complete conversation is attached as Exhibit C.
[8] See https://www.webmd.com/drugs/2/drug-6111/misoprostol-oral/details
[9] The complete conversation is attached as Exhibit D.

drugs.  In November of 2020, he had a conversation via Signal, where he says that he hopes there are people to purchase the drugs he is waiting for and that he has no qualms about selling LSD.[10]

Additionally, it does not appear that the defendant has shown any remorse or regret for the crime he was charged with.  And being arrested and jailed was not enough to cause Roychowdhury to repudiate violence.  In a phone call from jail on November 2, 2023, he tells someone, "go get 'em tiger," when she discusses her upcoming trip to Atlanta to engage in Stop Cop City protests.  In a call on February 11, 2024, he tells encourages a different person to talk to her Atlanta counterparts regarding starting "Stop Cop City" style activities in Fitchburg, where they are trying to build a new law enforcement facility.  While peaceful protesting is, of course legal, the defendant does nothing to suggest that the people he is speaking to should not engage in violence.  Because he has engaged in violence, the people he is speaking to may think that is what he is advocating without such a qualifier.

Despite his youth and lack of a long criminal record, Roychowdhury's history and characteristics show that he is unrepentant, and he therefore remains a danger, warranting a lengthy sentence.  The egregiousness of Roychowdhury's crime, combined with his progression to violence, and his apparent lack of remorse show that a long sentence is needed to reflect how serious it is to attack an organization, simply because its members have a differently ideology, to promote respect for the law when a defendant abandons civil discourse in favor of violence, to justly punish an arson on an

---

[10] The complete conversation is attached as Exhibit E.

advocacy group, to deter others who might seek to turn from discourse to violence, and to protect the public from a defendant who is seemingly unremorseful. In sum, the relevant Section 3553(a) factors call for a substantial sentence.

      C.      Similarly Situated Defendants

The defense has compared this case to *United States v. Fiero and Johnson* (WDWI Case No. 20-cr-134-jdp) in which two people set fire to two random retail buildings during the height of the George Floyd protests. (R. 13). However, fire is the really the only two things those cases have in common.

Fiero and Johnson were inebriated, relatively uneducated defendants who acted impulsively when they were swept up in a crowd of violence. The defendant's crime was thought out and planned, down to shutting off his cell phone for the hours surrounding the crime to avoid it being tracked. More importantly, here, the defendant targeted his victims based on ideological differences, rather than being swept up in a crowd of protesters. Thus, this case is more like *United States v. Penny*, 1:23-cr-226 (N.D. OH) where the defendant received an 18-year sentence for throwing Molotov cocktails at a church because it hosted drag; *United States v. Jordi*, 03-cr-60259-JIC-1 (S.D. Fla.) where the defendant received a 10-year sentence for planning to bomb abortion clinics in order to dissuade doctors from performing abortions); and *United States v. Holzer*, 19-cr-00488-RM (D. Colo.) where the defendant received a 235-month sentence for planning an attack on a synagogue due to his white supremacy ideology. While the Court must look at each case individually, these cases show that when an ideology drives the violence, the sentence should reflect that.

IV.    <u>CONCLUSION</u>

Roychowdhury attempted to firebomb an organization to intimidate those people with views different than his. For all of the reasons described above, he should not have the chance to continue to use violence against those who disagree with him for a very long time.  The Government respectfully requests that this Court sentence Roychowdhury to a sentence between 151 and 188 months.

Dated this 8th day of April 2024.

Respectfully Submitted,

TIMOTHY M. O'SHEA
United States Attorney

BY:   _____/s/_____

ELIZABETH ALTMAN
Assistant U.S. Attorney

/s/

_____

JUSTIN SHER
Trial Attorney
National Security Division